UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

 BALWINDER SINGH,

                    Plaintiff,              **MEMORANDUM & ORDER**
                                             19-CV-632(EK)(ST)

         -against-

 CITY OF NEW YORK, P.O. MANDEEP
 CHEEMA, individually and in his
 official capacity, et al.,

                    Defendants.

------------------------------------x
ERIC KOMITEE, United States District Judge:

          Balwinder Singh brought this suit against several

defendants, alleging Fourth Amendment claims under 42 U.S.C.

§ 1983, and various state-law claims.[1]  The parties cross-moved

for summary judgment; those motions are the subject of

Magistrate Judge Tiscione's Report and Recommendation (R&R)

dated June 28, 2022.  ECF No. 55.  The R&R recommends that the

Court deny Plaintiff's motion for summary judgment, grant

Cheema's motion for summary judgment on Singh's false-arrest

claim, and deny Cheema's motion on the claims for excessive

force, and assault and battery.

---

[1] The full list of defendants included: the City of New York; P.O.
Mandeep Cheema; and police officers "John Doe" #1-10.  As discussed in
Section II.B of this order, Singh's remaining claims are as follows: Section
1983 excessive force, state-law false arrest, and state-law assault-and-
battery against defendant Cheema; and Section 1983 municipal-liability
against the City.  The only claims at issue in the instant cross-motions are
the claims against Cheema.

Having reviewed the record, I adopt the R&R in part.
Singh's motion for summary judgment on his excessive-force claim
is DENIED.  Cheema's motion for summary judgment on Singh's
claims for false arrest and excessive force under Section 1983,
and assault and battery under state law, is GRANTED.  As
detailed below, Cheema is entitled to qualified immunity on the
excessive-force claim because no clearly established law
prohibited the force he applied in the effort to handcuff Singh
under the instant circumstances.  Summary judgment is warranted
on Singh's false-arrest claim, as well, for the reasons set out
in the R&R.

## I.   Background

The R&R capably sets out the factual background, which
I will not repeat wholesale here.  Because I diverge from the
R&R's recommendations on the excessive-force claim (and
corresponding state-law battery claim), I recite certain key
facts underlying those claims below.  I view the facts in the
light most favorable to Singh, drawing any inferences in his
favor.

Early in the morning on February 28, 2018, Singh's
wife called 911 to say that her husband was intoxicated and that
they were fighting.  Audio of 911 Call 01:22, Pl. Ex. D.  She
asked the operator to send an ambulance.  Pl. Rule 56.1
Statement of Material Facts ("Pl. 56.1") ¶ 7, ECF No. 46-2.  EMS

workers arrived at Singh's home shortly thereafter and determined that he needed to go to the hospital because he was acting irrationally, speaking incoherently, and displayed an unsteady gait.  Pl. 56.1 ¶ 13; Dep. of Nicole Milonas 85:24-86:4, ECF No. 46-8.  Singh was uncooperative and refused to go to the hospital, so EMS workers called for police assistance. Pl. 56.1 ¶¶ 20-21.  It is undisputed that Plaintiff's blood alcohol level was more than three times the legal driving limit when he was tested at the hospital two hours later.  Pl. Resp. to Def. Rule 56.1 Statement of Material Facts ("Pl. Resp to Def. 56.1") ¶¶ 114-15, ECF No. 49-1 (admitting that Plaintiff's BAC was 247 mg/dL two hours after his wife called 911).

Singh's home security system recorded video and audio of the EMS workers' arrival and call to police, but Singh deleted this recording after the incident.  Pl. Resp. to Def. 56.1 ¶ 54.  (Before he did so, Singh used his cell phone to record the portion of the video showing what he alleges to be excessive force, as discussed below.[2])  Nevertheless, it is undisputed that EMS contacted the NYPD, stating that they were attending to an uncooperative subject, and indicating — in two

---

[2] Singh contends that he deleted the video by "accident" and that it would have been overwritten anyway, fourteen days later, absent preservation. But Singh obviously realized that the video might be relevant later, and selected the portion he wanted to preserve.  Pl. Resp. to Def. 56.1 ¶¶ 51-55; Pl. Ex. G(1), Video (hereinafter "Video").

successive communications — that they required the NYPD's assistance "ASAP."[3]  When the officers arrived at Singh's home, Officer Cheema spoke with the EMTs on the scene.  One of the EMTs — Cheema did not recall which — told him, in substance, that Singh was being uncooperative to the point where they felt unsafe.  *Id.* ¶ 82.

Singh continued to refuse to go to the hospital.  Pl. 56.1 ¶¶ 33-35.  During this time, Singh addressed his wife in Punjabi.  Cheema, who understood what Singh was saying, testified that Singh was blaming his wife for the situation, stating, "You did this to me, you're going to pay, you did this," and "You're going to pay for what you did."  Dep. of Mandeep Cheema ("Cheema Dep.") 77:15-23, 80:12-13, ECF No. 48-7.  Singh disputes that he threatened his wife but acknowledges that he blamed her for the situation.  Pl. Resp. to Def. 56.1 ¶ 89 (Singh testified that he told her: "this is not right, you are sending me to the hospital with handcuffs on.  This is not right.  I had not done anything.").  After trying to convince Singh to go to the hospital voluntarily, Cheema gave Singh a choice: he could either go voluntarily, or the officers would have to take him in handcuffs.  Pl. 56.1 ¶¶ 29-31; Cheema Dep.

_____

[3] Pl. Resp. to Def. 56.1 ¶¶ 75-76 (admitting that the EMTs communicated to police "PLZ SEND RMP [radio motor patrol car], UNCO-COP PT [uncooperative patient]," and requested assistance a few minutes later, saying "RMP NEEDED ASAP").

85:7-87:15.  Singh agreed to go voluntarily and began to get
dressed.  Pl. 56.1 ¶¶ 31-33.

Singh's cell phone video shows the moments leading up
to the incident, and the incident itself.  Singh and the
officers stood close to the front door, preparing to leave the
apartment.  Officer Malinda Walker opened the front door, as
Officer Justin Davis stood to the side.  Video 7:24.  Officer
Cheema stood behind Singh.  Rather than walking out, however,
Singh leaned forward slightly and extended his arms behind his
back, towards Officer Cheema.  Video 7:30.  There is no audio,
but it is undisputed that at this point, Singh told Officer
Cheema the officer would "have to handcuff" him.  Pl. 56.1 ¶ 34;
Def. Rule 56.1 Statement of Material Facts ¶ 35, ECF No. 48-2.

Just as Officer Cheema took out handcuffs and began to
place them on Singh, however, Singh abruptly withdrew his hands
from behind his back, and said, "I'm just joking. You're not
going to handcuff me."  Pl. 56.1 ¶ 35.  The video, which
captured the scene from behind Cheema and Singh – and thus
provides a perspective similar to Cheema's – shows that Singh
withdrew his hands from behind his back and brought them out in
front of him.  At the same time, he took a quick step away from
Cheema and toward both the open door and Officer Walker.  Video
7:57-8:03; Dep. of Balwinder Singh ("Singh Dep.") 61:15-20, ECF
No. 48-6; Dep. of Malinda Walker 58:3-7, ECF No. 48-9.

5

As Singh stepped toward Officer Walker and the open door, Officer Cheema followed, moving forward and wrapping his arms around Singh from behind – his right arm over Singh's right shoulder, and his left arm under Singh's left arm.  Video 8:00-8:05.  Still holding onto Singh, Cheema pulled Singh's body to the right and then down to the ground.  Video 8:05.  Once Singh was on the ground, Cheema and the two other officers handcuffed him, lifted him up, and escorted him out the door.  Video 8:00-8:45.

The parties dispute how to characterize Cheema's maneuver: Singh refers to it as "body-slamming," *see* Pl. Opp. to Def. Mot. for Summ. J. ("Pl. Opp.") 22-26, ECF No. 49-1, but Defendants call it an "arm-bar takedown."  Def. Br. in Support of Def. Mot. for Summ. J. ("Def. Br.") 12, ECF No. 48-1.  These competing characterizations are not critical, given that the action was captured on video, and the video speaks for itself.

Cheema's action caused an abrasion and bruising on Singh's forehead and exacerbated Singh's pre-existing shoulder injury.  *See* Photos of Pl. Face Injury, Ex. L to Cohen Decl., ECF No. 46-15; Pl. Expert Reports, Ex. K to Cohen Decl., ECF No. 46-14.

## II.  Legal Standard on Review of Report & Recommendation

Generally speaking, when neither party files objections to a report and recommendation, the district court

6

reviews the recommendation for clear error.  See Advisory Comm. Notes to Fed. R. Civ. P. 72(b); *accord State Farm Mut. Auto. Ins. Co. v. Grafman*, 968 F. Supp. 2d 480, 481 (E.D.N.Y. 2013). Nevertheless, a district judge retains authority to "accept, reject, or modify" any recommendation.  28 U.S.C. § 636(b)(1). Section 636 gives R&Rs no "presumptive weight," *Mathews v. Weber*, 423 U.S. 261, 271 (1976); instead, district courts are free to review the case "in whole or in part anew."  *Id.*[4]

### III. Discussion

**A.   Excessive Force Claim**

1.   <u>Fourth Amendment Law on Excessive Force</u>

Under the Fourth Amendment, a police officer's application of force is excessive "if it is objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004). Courts must view the "reasonableness of a particular use of force . . . from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).

---

[4] *See also Mathews*, 423 U.S. at 271 (a district judge is "free to follow [the R&R] or wholly to ignore it," but either way the "authority and the responsibility to make an informed, final determination, we emphasize, remains with" him or her); *Cole v. Rogers*, No. 14-CV-3216, 2017 WL 1155002, at *1 (E.D.N.Y., 2017) (Bianco, D.J.) ("Although the parties have waived any objections to the R&R and thus de novo review is not required, the Court has conducted a *de novo* review of the R&R in an abundance of caution.").

Whether a particular use of force is reasonable or excessive depends on the specific facts and circumstances. Courts generally look at three factors: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.* Force must be "reasonably related to the nature of resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer." *Sullivan v. Gagnier*, 225 F.3d 161, 166 (2d Cir. 2000). Some circuit courts have recognized the second factor — the immediate threat to officer safety — as the most important. *See Pauly v. White*, 874 F.3d 1197, 1215-16 (10th Cir. 2017) ("The second *Graham* factor, whether the suspect posed an immediate threat to the safety of the officers or others, is undoubtedly the most important and fact intensive factor in determining the objective reasonableness of an officer's use of force."); *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994) (second factor is "the most important single element of the three specified factors").

When a subject refuses an order to place his hands behind his back to be handcuffed, officers may do what is "necessary to subdue [him] and apply handcuffs." *Husbands ex rel. Forde v. City of New York*, 335 F. App'x 124, 128 (2d Cir. 2009). The application of force is excessive in this context

(perhaps tautologically) when it goes "*beyond* what [is] necessary" to do the same.  *Id.*; *see also Curry v. City of Syracuse*, 316 F.3d 324, 332 (2d Cir. 2003) (plaintiff may prevail on excessive force claim "if he is able to show that [the officer] used more force than was necessary to subdue him").

    2.   <u>Qualified Immunity in the Excessive-Force Context</u>

        Singh's Fourth Amendment claim against Cheema, a police officer, must be viewed through the lens of qualified immunity.  *E.g.*, *City of Tahlequah v. Bond*, 142 S. Ct. 9 (2021) (per curiam); *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4 (2021) (per curiam).  "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  When an official asserts a qualified immunity defense, courts consider whether "(1) the official violated a statutory or constitutional right, and (2) . . . the right was clearly established at the time of the challenged conduct."  *Ricciuti v. Gyzenis*, 834 F.3d 162, 167 (2d Cir. 2016).[5]  "Officials are entitled to qualified immunity when their decision was reasonable, even if mistaken;

_____

[5] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

the doctrine gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Rogoz v. City of Hartford*, 796 F.3d 236, 247 (2d Cir. 2015).

In excessive-force claims, the reasonableness inquiry often "overlap[s]" with the qualified immunity analysis. *See, e.g.*, *Cowan v. Breen*, 352 F.3d 756, 764 (2d Cir. 2003); *Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003).  The difference is that "the qualified immunity inquiry goes on to ask whether any constitutional violation was clearly established." *Jackson v. Tellado*, 236 F. Supp. 3d 636, 661 (E.D.N.Y. 2017).  A constitutional right is clearly established "when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Rivas-Villegas*, 142 S. Ct. at 7; *see also Jones v. Treubig,* 963 F.3d 214, 224 (2d Cir. 2020) (right is clearly established when it would have been "clear to a reasonable officer that his conduct was unlawful in the situation he confronted").

The effort to identify clearly established controlling law "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam).  The Supreme Court has "repeatedly told courts not to define clearly established law at

too high a level of generality." *City of Tahlequah*, 142 S. Ct. at 11. "It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.; see also Kisela v. Hughes,* 138 S. Ct. 1148, 1152-53 (2018) (defendants will be "entitled to qualified immunity unless existing precedent *squarely governs the specific facts* at issue") (emphasis added).

Thus, although courts "do not require a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Id.* This is especially true in excessive force cases: the Supreme Court has said that "specificity is especially important in the Fourth Amendment context," where "it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.; see also Kisela*, 138 S. Ct. at 1153 ("Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue.").

The upshot is that qualified immunity may protect an officer who employs force that is objectively excessive under the Fourth Amendment, provided that the officer could *reasonably* — but mistakenly — have believed otherwise in the press of circumstances: "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231.

In recent qualified immunity cases, the Supreme Court has emphasized the importance of video evidence at the summary judgment stage. "Courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing summary judgment," which "usually means adopting . . . the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, where the record contains uncontroverted video evidence, the court "should . . . view the facts in the light depicted by the videotape." *Id.* at 381. Following this protocol, the Supreme Court recently unanimously overruled two courts of appeals on qualified immunity grounds based on video footage of the events. In *City of Tahlequah*, the Court summarized the video footage of a police shooting before holding that the officers had not violated clearly established law. 142 S. Ct. at 10-11. And in *Rivas-Villegas*, the Court relied on footage showing the defendant-officer placing his knee

on the suspect's back "for no more than 8 seconds," to conclude
that the officer was entitled to qualified immunity.  142 S. Ct.
at 7.

Watching the video evidence here, it is not clear that
any constitutional violation occurred — let alone a violation of
clearly established Fourth Amendment law.

### 3. Cheema's Actions Did Not Violate Clearly Established Law

As this caselaw establishes, a defendant is entitled
to summary judgment when, "looking at the evidence in the light
most favorable to, and drawing all inferences most favorable to"
the plaintiff, no reasonable jury "could conclude that it was
objectively unreasonable for the defendant to believe that he
was acting in a fashion that did not clearly violate an
established federally protected right." *Hartline v. Gallo*, 546
F.3d 95, 102 (2d Cir. 2008).  Put differently, summary judgment
is appropriate here if no reasonable jury could conclude that
Cheema violated a legal obligation that was "sufficiently clear
that every reasonable official would have understood" his
conduct to violate that obligation. *Rivas-Villegas*, 142 S. Ct.
at 7.

Evaluating the evidence and drawing inferences as
such, no reasonable jury could so conclude.  Simply put, neither
Plaintiff nor the R&R (nor I) have surfaced any case recognizing

13

a "clearly established" right that Cheema's actions, even viewed
in the light most favorable to the plaintiff, could be held to
violate.

        a.    Supreme Court and Second Circuit Cases on
              Excessive Force

        The Supreme Court and Second Circuit have decided a
substantial number of qualified immunity cases involving
allegations of excessive force.  Given the primacy of the
"clearly established" standard here, it behooves us to review
these cases in some detail.

        In *City of Tahlequah*, the Supreme Court unanimously
held that officers were entitled to qualified immunity.  142 S.
Ct. at 11.  There, the suspect's ex-wife had called the police
to say that he was intoxicated and that she was concerned the
situation would get "ugly."  *Id.* at 10.  The Court reviewed
uncontroverted video evidence of the incident, which showed that
when the officers tried to arrest the suspect, he refused to
comply with their orders; and when he picked up a hammer and
appeared ready to throw it at the officers, they shot him.  *Id.*
at 10-11.  The Court declined to reach the constitutional
question, instead proceeding directly to the "clearly-
established" question.  *Id.* at 12.  The Court held that none of
the cases relied on by the Tenth Circuit came even "close to
establishing that the officers' conduct was unlawful."  *Id.*

14

Accordingly, the officers were thus entitled to qualified immunity.  *Id.*

In *Husbands ex rel. Forde v. City of New York*, the Second Circuit upheld the district court's grant of summary judgment to an officer who had punched a *minor* suspect in an effort to put him in handcuffs.  335 F. App'x at 128-29.  The record showed that the plaintiff, whom the police believed had a gun (but from whom no gun was recovered), "was doing something with his hands that made it difficult to arrest him."  *Id.* at 129.  Where the officers reasonably feared for their safety, the court held that "[o]ne punch to a suspect who is resisting being put in handcuffs does not rise to the level of excessive force." The court held that no constitutional violation occurred *at all*, clearly established or otherwise.  *Id.*

The case that best supports Singh's argument is perhaps *Brown v. City of New York*, 798 F.3d 94, 102-03 (2d Cir. 2015).  There, the district court had granted summary judgment on constitutional — not qualified immunity — grounds, holding that no Fourth Amendment violation could be found where, after the plaintiff had refused to give her hands to be handcuffed, the officer took her to the ground, pushed her face into

pavement, and then pepper sprayed her twice in the face while she was on the ground.  *Id.*

The alleged excessive force in that case, too, was video-recorded.  Assessing the video, the Second Circuit found that all three *Graham* factors favored the plaintiff: the suspected crime was minor, she "posed no threat whatever to the safety of the officers or others," and "[a]s for actively resisting arrest, [she] was not fleeing, nor physically attacking an officer, *nor even making a move that an officer could reasonably interpret as threatening* an attack."  *Id.* (emphasis added).  On that basis, the Second Circuit concluded that the "assessment of a jury [was] needed."  *Id.* at 103; *see also id.* (stating that, for purposes of the constitutional analysis, "the factual determination of excessiveness" was for the jury in that case).

Singh's actions are distinguishable from Ms. Brown's. His quick move toward Officer Walker is reasonably interpreted as threatening, and / or as a first step toward flight through the open door.  Moreover, the amount of force the police used is

16

distinguishable: Brown was pepper-sprayed twice in the face at
close range; no similar force was applied to Singh.[6]

     *Brown* is distinguishable on another ground, as well:
the Court of Appeals' analysis relied fairly prominently on the
size disparity between the plaintiff and the officers who
effectuated her arrest.  798 F.3d at 101 ("Officer Plevritis was
5'10" and weighed 215 pounds; Officer Naimoli was 5'7" and
weighed 150–160 pounds; Brown was 5'6" and weighed 120
pounds.").  Reviewing the record, the Court of Appeals observed
that "no reason appears why, with Brown standing, each officer
could not have simply held one of her arms, brought it behind
her, and put handcuffs on her wrists." *Id.* at 102.  The court
continued:

> Police officers must be entitled to make a reasonable
> selection among alternative techniques for making an
> arrest.  But when the amount of force used by two
> police officers involves taking a 120-pound woman to
> the ground and twice spraying her directly in the face
> with pepper spray, the availability of a much less
> aggressive technique is at least relevant to making

---

[6] Singh contends that Cheema's use of force exacerbated a pre-existing
shoulder injury, Pl. Br. in Support of Pl. Mot. for Summ. J. 7, ECF No. 46-1,
but the Second Circuit has limited the inferences that may be drawn from that
contention in assessing whether the force was excessive.  In *Kalfus v. New
York & Presbyterian Hosp.*, 476 F. App'x 877, 880–81 (2d Cir. 2012), the
plaintiff had "resisted arrest by refusing to stand up or to permit himself
to be handcuffed"; he alleged that the defendant patrolmen employed excessive
force when they "turned him onto his stomach, pulled his arms behind his
back, placed handcuffs on him, and lifted him onto his feet by pulling his
arms, sweatshirt and waist."  In the process, they caused a "rotator cuff
tear" that was "an extension of a pre-existing" injury.  *Id.* at 881.  The
Second Circuit wrote that the plaintiff's shoulder injury did not support a
claim of excessive force because the officers "had no reason to know that
[his] existing shoulder injury might be aggravated if his arms were pulled or
he were handcuffed."  *Id.*  Here, too, Cheema had no reason to know about
Singh's pre-existing shoulder condition.

the ultimate determination of whether excessive force
was used.

*Id.* at 103.  Here, in contrast, Singh significantly outweighed

Officer Walker – the officer in whose direction he was headed

after he evaded Cheema's effort to handcuff him.  According to

the deposition testimony, Singh is five-foot-seven and weighed

190 pounds at the time of arrest, while Officer Walker was five-

foot-two and weighed approximately 140 pounds.  Singh Dep.

60:25-61:2; Dep. of Malinda Walker 6:2-13, ECF No. 48-9.[7]

The case of *Lennox v. Miller*, 968 F.3d 150, 156 (2d

Cir. 2020), is likewise distinguishable; there, the officer

brought plaintiff to the ground *after* he had already handcuffed

her, and then "put his full body weight on her, kneeling on her

back, and slammed her head into the ground, notwithstanding the

fact that she had already been handcuffed and positioned face

down."  *Id.*  The court held that a "jury could find that [the

officer] used unreasonable force on an individual who was not

resisting arrest and who was secured in such a manner that she

posed no threat to public safety."  *Id.; cf. Dunham v. City of

New York*, No. 11-CV-01223, 2021 WL 918373, at *7 (S.D.N.Y. Mar.

10, 2021) (no qualified immunity where "a reasonable jury could

---

[7] Following remand, the district court granted summary judgment again,
but on qualified immunity grounds — *i.e.*, on the basis that the Fourth
Amendment law had not been clearly established when Ms. Brown was arrested.
The Second Circuit upheld that decision.  *Brown v. City of New York*, 862 F.3d
182, 190-92 (2d Cir. 2017).

find that [plaintiff] no longer posed an immediate threat . . .
and . . . was no longer resisting," and therefore "that the
officers *gratuitously* inflicted pain in a manner that was not a
reasonable response to the circumstances once Plaintiff was no
longer resisting arrest" (emphasis added)).  For obvious
reasons, *Dunham* does not map well onto the instant facts: the
video leaves no dispute that Singh had declined to submit to
handcuffing at the time of Cheema's brief action.

Plaintiff cites some of these cases in passing, but in
the end does not successfully identify a source of clearly
established law that Cheema's actions could be found to violate.
In one brief paragraph analyzing the qualified immunity defense
to the excessive-force claim, the R&R invokes the unpublished
report and recommendation of the magistrate judge in *Hicks v.
City of New York*, 2015 WL 5774575, at *3 (E.D.N.Y. 2015).  The
allegations in that case were markedly different from those
here:

> Plaintiff states that the officers used something to
> break down his door and that the first officer to
> enter was wearing a helmet and shield.  He claims this
> officer punched him in the face and that the other
> officers attacked him by punching, kicking, and tasing
> him even before he had a chance to say anything.
> Specifically, Hicks claims that when the first officer
> entered, plaintiff simply stood there, tried to ask
> what was going on, but the officer punched him in the
> face and his head was slammed against a wall.
> According to plaintiff, even though he put up no
> fight, he was attacked by approximately eight officers
> and taken down to the floor. . . .  Plaintiff alleges

> that he was struck below his right eye with a taser
> prong, that this taser prong hooked into his cheek,
> and that an officer yanked the hooked prong out of his
> face. He was also struck with the taser in the left
> arm and in his torso several times.

*Id.*; *see also id.* at *10 ("Hicks asserts he did nothing to provoke any use of force and that the defendants' punches, kicks and taser use were gratuitous."). There was no video evidence in that case. *Hicks* does not "clearly establish," at the requisite level of specificity, any rule of law applicable to this case.[8]

### b. Cheema's Actions "Clearly Violate" No Rule Emerging from These Cases

Applying these cases to the undisputed evidence here, including especially the video footage, no reasonable jury could conclude that Officer Cheema violated clearly established law. Two of the three *Graham* factors strongly favor Cheema. First, the video makes clear that Singh was resisting being handcuffed. Plaintiff acknowledges that he refused to go to the hospital voluntarily, at which point Cheema gave Singh the choice: come voluntarily, or the officers would place him in handcuffs. Pl.

---

[8] Furthermore, it is not entirely clear that an order issued at the district court level can "clearly establish" anything for purposes of qualified immunity. The Supreme Court has recently suggested (albeit obliquely) that the relevant universe of case law may be limited to Supreme Court authority. *See, e.g.*, *Reichle v. Howards*, 566 U.S. 658, 665-66 (2012) ("Assuming arguendo that controlling Court of Appeals' authority could be a dispositive source of clearly established law in the circumstances of this case, the Tenth Circuit's cases do not satisfy the 'clearly established' standard here."); *Rivas-Villegas*, 142 S. Ct. at *2 ("Even assuming that controlling Circuit precedent clearly establishes law for purposes of § 1983 . . . .").

Opp. 4 (citing Cheema Dep. 82-89).  Singh first indicated his
intent to go voluntarily, but then changed course: he said that
the officers would "have to handcuff him."  Pl. 56.1 ¶¶ 33-35.
As the video shows, Singh then extended his hands behind him,
and Officer Cheema took out handcuffs and began to place them on
Singh.  Then Singh changed course again: he withdrew his hands
from behind his back, brought them out in front of him, and took
a quick step away from Cheema.  Video 7:55-8:00.

        Second, the video shows that it was utterly reasonable
for Cheema to conclude that Singh posed a risk to officer safety
and a risk of flight through the open door.  The video shows
Singh taking a sudden step towards Cheema's partner, Officer
Walker, with his (Singh's) hands out in front of him.[9]  Cheema
watched Singh move in that direction.  *E.g.*, Cheema Dep. 102:16-
24 ("It was a sudden step towards my partner. . . . At that
point, based off of his behavior, and based off of everything
that led up to that point, just different levels of aggression
that he kept displaying the whole time, his behavior changing,
and at that point I no longer felt, like, okay this is a safe

---

[9] Cheema testified, and Singh does not dispute, that as Singh withdrew
his hands and stepped away from Cheema, he stated, "I'm just joking, you're
not going to handcuff me."  Pl. 56.1 ¶ 35.  It should go without saying that
Singh cannot benefit from his claim to have been joking.  Even if he had been
joking about *submitting to be handcuffed*, that says nothing about his intent
to flee or harm someone else on the premises.  Moreover, Singh's subjective
motivations are largely irrelevant.  "Our focus is not on [plaintiff's]
motivations but instead on the sequence of events from the perspective of a
reasonable officer at the scene."  *Tracy v. Freshwater*, 623 F.3d 90, 93, 97
(2d Cir. 2010).

scene. . . .").  The video also corroborates Cheema's testimony
that he could not see Singh's hands and did not know what he was
doing with them, because the video shows Cheema standing behind
Singh as he moves forward towards Officer Walker.  Video 8:00;
*see* Cheema Dep. 103:10-11 ("It was just the initial action of
him bringing his hands to the front and saying, 'No, no, no,
you're not going to handcuff me.' Then he took that sudden step,
which made me no longer feel safe.").[10]

As Judge Tiscione acknowledged, "Cheema's use of force
against Plaintiff was deployed as an instantaneous response to a
potential safety threat he posed against Walker."  R&R 8.  Singh
might have been able to overpower Walker or grab one of the
officers' weapons.  *See generally Pinero v. Burbran*, 18-CV-4698,
2021 WL 4224727, at *4 (S.D.N.Y. Sept. 16, 2021) ("Plaintiff's
active resistance of arrest and his physical hold on [the
officer's] uniform posed the immediate threat that Plaintiff
would be able to overpower the officers or grab one of their
weapons."); *see also MacLeod v. Town of Brattleboro*, 548 F.
App'x 6, 8 (2d Cir. 2013) (use of a taser was objectively
reasonable where fleeing motorist pulled into an abandoned lot
in surrender, got out of his car and kneeled on the ground, but

---

[10] The third officer on this scene — Officer Davis — shared Cheema's
assessment that Singh was potentially dangerous.  *E.g.*, Dep. of Justin Davis
120:15-122:24, ECF No. 48-8 ("I didn't know what he was going to do. . . . I
thought he could attack anybody.").

subsequently "rose to his feet, turned to face the officers with his hands free and outstretched, and refused to return to the ground.").

In sum, given Singh's apparent refusal to be handcuffed, his erratic behavior and high level of intoxication, the fact that the EMTs told him that before the police arrived, Singh was uncooperative to the point where they were concerned for their safety, and his sudden movement in the direction of Officer Walker, no reasonable jury could find Cheema liable over a qualified immunity defense.  Cheema is entitled to qualified immunity (and therefore summary judgment) on Plaintiff's excessive-force claim.

**B.   State-Law Claim for Assault and Battery**

Summary judgment is also granted as to Plaintiff's state-law assault and battery claim.

"Except for § 1983's requirement that the tort be committed under color of state law, the essential elements of excessive force and state law assault and battery claims are substantially identical."  *Humphrey v. Landers*, 344 F. App'x 686, 688 (2d Cir. 2009).  While "the doctrine of qualified immunity applies to federal causes of action but is not generally understood to protect officials from claims based on state law," *Stein ex rel. Stein v. Barthelson*, 419 Fed. Appx. 67, 71 (2d Cir. 2011), New York State has its own analogue.  The

New York courts "grant government officials qualified immunity on state-law claims except where the officials' actions are undertaken in bad faith or without a reasonable basis." *Jones v. Parmley*, 465 F.3d 46, 63 (2d Cir. 2006).

Given my analysis on the excessive force claim, qualified immunity applies to the battery claim too. *See, e.g.*, *Felix v. City of New York*, 408 F. Supp. 3d 304, 312 (S.D.N.Y. 2019) ("The finding of qualified immunity on the excessive force claims requires a grant of summary judgment on assault and battery as well."); *Mesa v. City of New York*, No. 9-CV-10464, 2013 WL 31002, at *27 (S.D.N.Y. Jan. 3, 2013) ("Thus, as the force employed against Mesa was objectively reasonable under the circumstances - giving rise to a finding of qualified immunity - her assault and battery claims must fail as well.").

\*     \*     \*     \*     \*

There is a robust debate underway — in federal courts, in the academic literature, and elsewhere — about the origins and application of the doctrine of qualified immunity. *See, e.g.*, *McKinney v. City of Middletown,* 2022 WL 4454475, at *12-14, *20-23 (2d Cir. Sept. 26, 2022) (discussing the wisdom of qualified immunity in majority and dissenting opinions); *see also* William Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. 45 (2018). Together with *Monell v. Dept. of Social Servs.*, 436 U.S. 658 (1978), the doctrine of qualified immunity creates

a void in the constitutional landscape: it is a regular occurrence that citizens who believe their constitutional rights have been violated run headlong into the qualified immunity doctrine when they bring claims against individual law enforcement officers, and into *Monell* when they pursue the relevant municipality.

District courts must, however, take the law of qualified immunity as they find it.  And the facts of this case — involving an officer who used a single, facially reasonable maneuver to subdue a suspect who was undisputedly resisting arrest after a series of erratic actions (whether his intent was "joking" or not) — do not even approach the point where the shield of qualified immunity begins to lift, given recent Supreme Court precedent.

**C.   Other Claims**

Plaintiff originally brought additional claims against Cheema, the City, and "John Does" #1-10.  In Plaintiff's opposition brief, he agreed to dismiss several claims: negligent hiring and retention, failure to intercede, and intentional infliction of emotional distress.  Pl. Opp. 27 n.17; *see also* R&R 5.  These claims may be "dismissed at the plaintiff's

request only by court order." Fed. R. Civ. P. 41(a)(2). Those claims are hereby dismissed.

Plaintiff also brought a municipal liability claim against the City under Section 1983. Defendants state, in their opposition brief, that "Plaintiff has agreed to withdraw this claim. The parties will submit an appropriate stipulation of partial dismissal." Def. Br. 1. Upon review of the docket, however, the parties do not appear to have filed that stipulation. The parties are ordered to indicate in letters, no later than October 6, 2022, whether Plaintiff has stipulated to the dismissal of the municipal liability claim, and if not, to describe the current status of that claim.

Finally, to the extent Plaintiff has any remaining claims against "John Doe" defendants, those are dismissed because Plaintiff has not identified them even after the close of discovery. *See Keesh v. Artuz*, No. 97-CV-8417, 2008 WL 3166654, at *2 (S.D.N.Y. Aug. 6, 2008) ("Even after discovery, plaintiff has failed to identify the 'John Doe' and 'Jane Doe' defendants. Accordingly, the complaint against them must be dismissed.").

## IV. Conclusion

For these reasons, I adopt the R&R in part. Plaintiff's motion for summary judgment on his excessive-force claim is DENIED, and Cheema's cross-motion for summary judgment

is GRANTED as to Plaintiff's Section 1983 claims for false arrest and excessive force, and state-law claim for assault and battery.  The parties shall file letters by October 6, 2022, indicating whether they have stipulated to the dismissal of the municipal liability claim, and (if not) whether they intend to do so.

      SO ORDERED.


                                       /s/ Eric Komitee
                                     ERIC KOMITEE
                                     United States District Judge


Dated:      September 30, 2022
             Brooklyn, New York